**SOUTHERN CONCRETE COMPANY**

v.

**UNITED STATES STEEL CORPORATION, Individually and through its Universal Atlas Cement Company Division, et al.**

**Civ. A. No. 15378.**

United States District Court, N. D. Georgia, Atlanta Division.

March 31, 1975.

Wilkinson, Nance & Wittner, Skinner, Wilson, Beals & Strickland, Atlanta, Ga.,

John H. Boone, San Francisco, Cal., for plaintiff.

Mitchell, Pate & Anderson, King & Spalding, Jones, Bird & Howell, Atlanta, Ga., Worsham, Forsythe & Sampels, Dallas, Tex., Covington & Burling, Washington, D. C., for defendants.

## ORDER

RICHARD C. FREEMAN, District Judge.

This private antitrust action was instituted by plaintiff Southern Concrete Company (hereinafter "Southern"), a now-defunct subsidiary of Southern Products Company. From the late 1950's until October, 1969, plaintiff was engaged in the production and sale of ready-mixed concrete in the Atlanta area. The action is brought against United States Steel Corporation (hereinafter "U.S.S.") which, through its Universal Atlas Cement Division (hereinafter "U.A.C."), is a major supplier of portland cement, one of the ingredients of ready-mixed concrete, and against Williams Brothers Concrete, Inc. (hereinafter "Williams Brothers"), a producer of ready-mixed concrete in the Atlanta area.[1] The action has been submitted to the court on the motion of U.S.S. for partial summary judgment; on its motion to strike the affidavit of Walter B. Dobbins, which affidavit was submitted with the brief in opposition to the motion for partial summary judgment; and on U.S.S.'s second motion for partial summary judgment. In this order the court will rule on U.S.S.'s first motion for partial summary judgment and on its motion to strike. An order on the second motion for partial summary judgment will be issued forthwith.

## I. MOTION FOR PARTIAL SUMMARY JUDGMENT

U.S.S. seeks summary judgment as to the following issues for the reasons in-

1. The complaint also named Gifford-Hill & Company, Inc. as a defendant. Pursuant to a consent stipulation filed on December 26, 1973, that party was given until thirty days after final judgment and final decision on any appeal therefrom as to U.S.S. and Williams Brothers to respond to the amended complaint.

dicated: (1) Southern lacks standing under the provisions of § 4 of the Clayton Act, 15 U.S.C. § 15, to assert the claim that U.S.S. has violated § 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in an illegal tying arrangement where the granting of a loan guarantee (the alleged tying product) to Williams Brothers was conditioned upon Williams Brothers' agreement to purchase cement (the alleged tied product) from U.A.C.; (2) Southern lacks standing under § 4 of the Clayton Act to assert the claim that U.S.S. and Williams Brothers have violated § 1 of the Sherman Act by engaging in reciprocal dealings wherein U.S.S. agreed to supply a loan guarantee to Williams Brothers if the latter would agree to purchase cement from U.A.C.; (3) Southern lacks standing under § 4 of the Clayton Act to assert the claim that U.S.S. violated § 3 of the Clayton Act, 15 U.S.C. § 14, by selling cement to Williams Brothers on the condition that Williams Brothers not use or deal in the cement of any other cement producer; (4) Southern lacks standing under the provisions of § 4 of the Clayton Act to assert the claim that U.S.S. and Williams Brothers have violated § 1 of the Sherman Act by engaging in reciprocal dealings wherein Williams Brothers agreed to provide storage facilities to U.S.S. if U.S.S. would agree to provide the services of one Roy Millhouse to Williams Brothers; (5) Southern cannot assert the claims that U.S.S. has violated § 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in a "conspiracy to attempt to monopolize" the production and sale of both cement and ready-mixed concrete in any geographic market for the reason that such does not assert a violation of any law; (6) U.S.S. has not violated § 7 of the Clayton Act, 15 U.S.C. § 18, by acquiring the stock or assets of Williams Brothers since it is undisputed that U.S.S. has never acquired any stock or assets of Williams; (7) U.S.S. has made no discriminatory sales to Williams in violation of § 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), since Southern has at no relevant time purchased cement from U.S.S.; and, (8) U.S.S. cannot have violated § 2 of the Sherman Act by (a) monopolizing and (b) attempting to monopolize the production and sale of ready-mixed concrete for the reason that it would be impossible as a matter of law for U.S.S. to be found to have attempted to monopolize or to have monopolized a product which it neither manufactures nor sells. In compliance with Local Court R. 91.1 and 91.72, U.S. S. has filed a brief in support of its motion and a separate short statement of the material facts as to which it contends there is no genuine issue to be tried. It has also attached to the motion two affidavits in support thereof.

In response plaintiff has filed a lengthy brief in opposition to the granting of any portion of the motion for partial summary judgment. This brief includes a counterstatement of facts necessary to determine the issues presented by the motion. The affidavit of Walter B. Dobbins was filed several days later "for use as evidence" in opposition to U.S.S.'s motion for partial summary judgment.

Included in plaintiff's brief in opposition to the partial summary judgment motion is an extensive dissertation on the "judicial standards governing seriatim summary dispositions sought by the instant motion." It has cited extensive case law for the following propositions: (1) summary judgment is to be very carefully employed when a jury trial has been requested; (2) the court must construe all allegations in the light most favorable to the opposing party, (3) summary judgment should not be granted if there are conflicting inferences from the uncontested facts, (4) on a motion for summary judgment the court can only decide if there are issues to be decided, and (5) the moving party must shoulder the burden to establish the absence of genuine material facts. The court agrees with these proposi-

tions [2] and is aware of the requirements of Rule 56, the heavy burden on the movant, and the importance of a jury trial. However, the court also agrees with the assertion of U.S.S. that summary judgment can be appropriate as to claims under the antitrust laws, and that the burden imposed on the moving party by Rule 56(e) [3] applies to parties seeking relief under the antitrust laws as well as any other civil action. First Nat'l Bank v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). *See also* Searer v. West Michigan Telecasters, Inc., 381 F.Supp. 634 (W.D.Mich.1974).

A. *Claims as to Illegal Tying Arrangements, Reciprocal Dealings, and Exclusive Dealings between Defendants U.S.S. and Williams Brothers*

U.S.S. contends that Southern cannot assert a claim for damages on account of tying arrangements, reciprocal dealings or exclusive dealing arrangements between U.S.S. and Williams Brothers pursuant to § 4 of the Clayton Act because it is not within the limited class of persons who could raise such a claim. U.S.S. contends that the only persons who could raise such a claim are the competitors of U.S.S./U.A.C. and the customers of U.S.S./U.A.C. which are subject to the alleged restraint. It contends that there is no dispute that U.S.S., through U.A.C., is a producer and supplier of cement and has sold, and does

sell, cement to Williams Brothers; that U.A.C. has never produced or sold ready-mixed concrete in competition with Southern; that Southern has never manufactured or sold cement in competition with U.A.C.; and that Southern has not purchased cement from U.A.C. within the period of limitations. *See* U.S.S.'s Statement of Material Facts, No. 1, 3, 4, 5, 10. U.S.S. further contends that plaintiff could not have been "injured in his business or property by reason of" these alleged violations within the meaning of § 4 of the Clayton Act. It sets forth the main tests or standards used by the various Courts of Appeals to determine whether a particular action or claim may be asserted under § 4 and asserts that Southern cannot pursue these claims against U.S.S. under these tests.

Southern contends that whether or not the tying, exclusive dealing and reciprocal dealing arrangements of defendants "were a substantial factor in causing damages" claimed by plaintiff is a question of fact and, thus, not susceptible to summary disposition. It argues that § 4 of the Clayton Act is to be given a liberal construction and that it is within the "zone of protected interests" [4] contemplated by that section. It defines the interests which it seeks to protect as follows:

> its rights to purchase gray Portland cement and other ready-mixed concrete ingredients, along with the serv-

---

2. With respect to the proposition that the court can only decide if there are issues to be decided, plaintiff's brief stresses that if the court determines on a motion for summary judgment that material issues of fact exist, it cannot decide the fact issues at that time, even if the adverse party is unlikely to prevail at trial as to that issue. We agree. As Rule 56(d), Fed.R.Civ.P. itself makes clear, however, if on a motion for summary judgment under Rule 56 judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court shall if practicable, ascertain what material facts exist without substantial dispute upon the trial of the action the facts so specified are deemed established.

3. Rule 56(e) provides, in pertinent part:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment if appropriate shall be entered against him.

4. See Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

ices incidental to the purchase of these goods; and thereby to produce and sell ready-mixed concrete in a market unaffected by unlawful restraints.

Plaintiff argues, that in Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 20 (5th Cir. 1974) (hereinafter *"Terrell III"*), the Fifth Circuit Court of Appeals expanded the class of protected private plaintiffs by holding that a private right of action under § 4 of the Clayton Act should be recognized when the plaintiff makes a mere showing that defendants' alleged violation of the antitrust laws had "materially contributed" to plaintiff's injuries. Plaintiff further contends that it is within the sector of the economy threatened by defendant's practices, which area he seeks to define as the production and sale of ready-mixed concrete in the Atlanta Metropolitan market area.

 Section 4 of the Clayton Act authorizes a private plaintiff to sue for injuries sustained as a consequence of an antitrust violation, Battle v. Liberty Nat'l Life Ins. Co., 493 F.2d 39, 48 (5th Cir. 1974). This section provides:

> Any person who shall be injured in his *business or property by reason of* anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. (Emphasis added.)

By the terms of § 4, therefore, two criteria must be satisfied before standing is established: the plaintiff must show that he has suffered injury to "business or property" and he must show that his injuries were incurred "by reason of" the defendant's illegal activities. Battle v. Liberty Nat'l Life Ins. Co., *supra*; In re Multidistrict Vehicle Air Pollution M.D.L. 31, 481 F.2d 122, 126 (9th Cir. 1973). *And see* Dailey v. Quality School Plan, Inc., 380 F.2d 484, 487 (5th Cir.

1967). While § 4 is to be accorded a liberal construction, see Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), it does not accord a right of action to every person who may have felt some "ripple effect" of the violation. Billy Baxter v. Coca Cola Co., 431 F.2d 183, 187 (2d Cir. 1970). The Supreme Court has acknowledged that the lower federal courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation. Hawaii v. Standard Oil Co., 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). In In re Multidistrict Vehicle Air Pollution M.D.L. 31, *supra*, the various limitations employed by the Courts of Appeals are set forth. We need not apply each of those tests to the claims addressed by this portion of the summary judgment motion; in this circuit a plaintiff who asserts that he has suffered injuries "by reason of" the defendants' illegal activities must show that he is "within the sector of the economy in which the violation threatened a breakdown of competitive conditions and that he was proximately injured thereby." Battle v. Liberty Nat'l Life Ins. Co., *supra* at 49; Dailey v. Quality School Plan, Inc. *supra* at 487 *quoting* South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir. 1966).

 Clearly, to determine the sector of the economy in which an antitrust violation threatened a breakdown of competitive conditions and to determine who can be considered to be proximately injured by an antitrust violation, the court must look to the nature of the antitrust violation itself. A tying arrangement may be defined as an agreement by a party to sell one's product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.

Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The seller uses his leverage in the market for the tying product in order to gain an advantage in the tied market. *Id.* Thus, the buyer is "coerced" into agreeing to take a product he does not want in order to obtain an article he desires, United States v. Loew's, Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); and the result is that competing sellers in the tied market are "foreclosed" by the tie-in and competition "on the merits" in the tied product is prevented. *Id.*; Times Picayune Publishing Co. v. United States, 345 U.S. 594, 605, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).[5] Thus, the Supreme Court cases make clear that the area of the economy in which a tying arrangement threatens a breakdown of competitive conditions is the market for the tied product and that those who would be proximately injured by such an arrangement would be the purchasers[6] of the tied product and the sellers of the tied product in competition with the seller who imposes the tie-in. Similarly, where in an exclusive dealing arrangement a party binds himself to purchase a product only from a certain seller, he is foreclosed from obtaining the product at a lower price or of higher quality from other sellers. Thus, competition as

to the product is threatened and the purchaser and other sellers of the product are injured. A similar analysis applied to a reciprocal dealing arrangement leads to a conclusion that purchasers of the products which are the subject of the arrangement and the competitors for the sale of such products are the injured parties and competition as to such products is foreclosed.

In the instant case, the tying arrangement[7] was the extension of direct and indirect loans (the tying product) by U.S.S. to Williams Brothers conditioned on the purchase from U.S.S. of cement (the tied product) by Williams Brothers.[8] Similarly, the challenged reciprocal dealing arrangement[9] involves U.S.S.'s guaranteeing of a loan and/or U.S.S.'s providing the services of Mr. Millhouse to Williams Brothers in return for purchase of cement by Williams Brothers from U.S.S. The exclusive dealing violation[10] arises from the sale of cement on the condition or understanding that the purchaser of cement would not use or deal in the cement of any other cement producer. In each of these arrangements the tied product or the product which is the subject of the agreement is cement. Thus, the area of the economy threatened with a breakdown of competitive conditions is cement sales and those who could claim to

---

5. In Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), the Supreme Court held that an extension of credit by a subsidiary of a manufacturing company conditioned on the borrower's promise to purchase the product of the parent company could amount to an illegal tie-in.

6. *See* note 13, *infra.*

7. For purposes of this motion U.S.S. assumes arguendo that the arrangement as to credit and cement purchases from U.S.S. by Williams Brothers could be termed a tying, exclusive dealing, or reciprocal dealing arrangement and that it is a violation of the antitrust laws. The court's reference to a tying, exclusive dealing or reciprocal dealing arrangement between these defendants is not, of course, a finding or conclusion that the arrangements between these defendants were such or violated the antitrust laws.

8. See Counterstatement of Material Facts in plaintiff's brief in opposition at page 9: " . . . UAC was in full agreement with U.S.S.'s proposed 'tying arrangement' to secure a captive Atlanta market *for sale of UAC's cement product.* . . . " (Emphasis added.) It is important to note that in all the briefs submitted in connection with the motion, the parties assume that cement and ready-mixed concrete are not one and the same, i. e. that they are not interchangeable, and that sellers of cement are not in competition with sellers of ready-mixed concrete. Thus, the relevant market for cement sales differs from the relevant market for ready-mixed concrete sales.

9. *See* note 7, *supra.*

10. *See* note 7, *supra.*

be proximately injured by such arrangements by U.S.S. are purchasers [11] of cement from U.S.S. pursuant to such an arrangement or competitors of U.S.S. in cement sales. Since plaintiff nowhere denies the assertions in U.S.S.'s Statement of Material Facts [12] that it did not purchase cement from U.S.S. during the relevant statute of limitations period,[13] and that it was never a seller of cement, as distinguished from ready-mixed concrete, in competition with U.S.S./U.A.C., the court finds that it does not compete in the area of the economy which would be threatened with a breakdown of competitive conditions by the challenged arrangements, cement sales, and further, finds that it would not be proximately injured by such arrangements. Thus, applying the test utilized in the Fifth Circuit to determine whether a party can allege to be injured "by reason of" an antitrust violation, and thus has standing to claim damages pursuant to § 4 of the Clayton Act for such antitrust violation, we find that Southern does not have standing to seek damages on account of the alleged tying, reciprocal dealing or exclusive dealing arrangements between U.S.S./U.A.C. and Williams Brothers with respect to U.S.S./U.A.C.'s sale of cement to Williams Brothers.

█ We reject the contention made by plaintiff that the question of causation is necessarily a question of fact which cannot be decided on a motion for summary judgment and must be submitted to the jury. Plaintiff's assertions of injury in its brief are general allegations of injury due to an alleged conspiracy between U.S.S. and Williams Brothers to restrain trade in and to monopolize the ready-mixed concrete market; it makes no attempt to specify injuries to it due to the alleged tying, exclusive dealing or reciprocal dealing arrangements. Further, as noted above, plaintiff has made no attempt to show that it was a seller of cement or a purchaser of cement from U.S.S./U.A.C. This fails to satisfy the burden imposed on a party opposing summary judgment. Rule 56(e), Fed.R.Civ.P. As stated in *First Nat'l Bank v. Cities Service Co.,* *supra:*

> To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations of their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*Id.* 391 U.S. at 289–90, 88 S.Ct. at 1593.

█ The court also rejects plaintiff's contention that in *Terrell III, supra,*

---

11. *See* note 13, *infra.*

12. Pursuant to Local Court R. 91.72 "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." We do not rely solely on the failure of Southern to controvert these assertions, however, as its brief makes clear that it does not contend that it purchased, directly or indirectly, cement from U.S.S./U.A.C. during the statute of limitations period, or that it was a manufacturer or seller of cement at any time.

13. Since Southern does not allege that it was either a direct or indirect purchaser of cement from U.S.S./U.A.C., the issue of whether an indirect purchaser, that is, a purchaser of the product at a subsequent level in the chain of distribution may recover for the alleged violations asserted herein is not presented. As a result, we need not and do not decide herein whether such indirect purchasers could claim to be proximately injured "by reason of" antitrust violations such as the one here in question.

the Fifth Circuit Court of Appeals expanded the class of protected private plaintiffs by holding that a private right of action under § 4 of the Clayton Act should be recognized when the plaintiff makes a mere showing that defendants' alleged violation of the antitrust laws had "materially contributed" to plaintiff's injuries. The *Terrell III* opinion involved an appeal by the defendant from a trial on damages. Earlier in the action the district court judge, after a jury verdict in plaintiff's favor, had entered judgment on the verdict against this defendant and judgment notwithstanding the verdict in favor of the individual defendants. On defendant's (first) appeal a majority of the original panel in the Court of Appeals vacated the judgment against the defendant and remanded the case for a new trial. Household Goods Carriers' Bureau v. Terrell, 417 F.2d 47 (5th Cir. 1969). Upon rehearing en banc, a majority of the Court affirmed the district court's judgment against the defendant, but reversed for a new trial on the issue of damages. Household Goods Carriers' Bureau v. Terrell, 452 F.2d 152 (5th Cir. 1971) (en banc). In *Terrell III* the panel reviewed this subsequent trial on damages. That it did not intend to set forth a new test on standing nor deal with causation in fact is made perfectly clear in the *Terrell III* opinion; the Court emphasized that "the *en banc* decision establishing liability finally adjudicated the issue of causation" and that "the decision of this court sitting *en banc* at an earlier stage of this same case represents the law of the case." 494 F.2d at 19. The *Terrell III* Court was thus concerned with the measure of proof as to amount of damages rather than causation. As stated in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) (and quoted in *Terrell III*):

> [T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes recovery of uncertain damages applies to such as are not the *certain* result of the wrong, not to those damages which are *definitely* attributable to the wrong and only uncertain in respect of their amount. (Emphasis added.)

*See also* Shumate & Co. v. National Ass'n of Securities Dealers, Inc., 509 F.2d 147, 153 (5th Cir., 1975) ("although [the Court is] generally lenient as to evidence required to show the amount of damages in antitrust matters once liability is determined, courts do not permit the fact of damage necessary to prove liability to be based on speculation."); Hobart Bros. Co. v. Malcolm T. Gilliland, Inc., 471 F.2d 894, 901–02 (5th Cir. 1973), cert. denied, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150.

The court's conclusion is that plaintiff does not have standing to claim damages on account of the tying, exclusive dealing or reciprocal dealing arrangements between U.S.S./U.A.C.; it is not a ruling on admissibility of evidence with respect to claims which are not foreclosed by this order, for example, the alleged conspiracy to restrain trade in or to monopolize the ready-mixed concrete and cement markets. *Cf.* Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Rulings on admissibility of evidence as distinguished from sufficiencies of claims, is best reserved for trial.

We hold that plaintiff lacks standing under § 4 of the Clayton Act to recover damages "by reason of" the alleged tying, exclusive dealing or reciprocal dealing arrangements between defendants U.S.S. and Williams Brothers. To that extent, this portion of the motion for partial summary judgment is granted.

### B. *Alleged Conspiracy to Attempt to Monopolize*

U.S.S. further seeks partial summary judgment on the ground that

Southern cannot assert the claims that U.S.S. has violated § 2 of the Sherman Act, by engaging in a "conspiracy to attempt to monopolize" the production and sale of both cement and ready-mixed concrete for the reason that such does not assert a violation of any law. Plaintiff opposes this portion of the summary judgment motion contending that its charged violation, "conspiracy to attempt to monopolize," is within the Congressional intention of § 2 of the Sherman Act and that the violation is distinguishable from the charge of attempt to monopolize in that it does not require the showing of specific intent, but, rather is established upon commission of predatory acts pursuant to the alleged conspiracy to monopolize.

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides:

> Every person who shall monopolize, or attempt to monopolize, or combine and conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

The court agrees with defendant U.S.S. that three distinct offenses are to be found in this provision: (1) monopolization, (2) attempt to monopolize, and (3) combination or conspiracy to monopolize. Plaintiff's contention that in United States v. Dunham Concrete Prod., Inc., 501 F.2d 80 (5th Cir. 1974), the Fifth Circuit Court of Appeals recognized the crime of a conspiracy to attempt to monopolize "by failing to hold that its inclusion in the lower Court's charges to a jury was reversible error" is totally without merit. *Dunham* involved an appeal from an order granting a new trial pursuant to 28 U.S.C. § 2255. The court held that the submission to the jury of a form for recording their verdict [14] which listed as separate counts "Conspiracy to attempt to monopolize in violation of Section 2 of the Sherman Act" and "Conspiracy to attempt to extort", which form had been prepared by counsel for defendant, did not warrant relief from judgment pursuant to § 2255. Accordingly, it reversed the trial court as to this portion of its order. The Court's reversal was not based on a finding that there is a separate crime of "conspiracy to attempt to monopolize" in § 2 of the Sherman Act. It was based on the finding that the *"error* in wording of this form for recording the verdict did not contribute to [the] conviction." *Id.* at 84 (emphasis added).[15] It further mentioned that when Government counsel objected to the form, "[u]naccountably" the court adopted it as presented and sent it out with the jury. There is nothing in the opinion to suggest that a separate offense exists for "conspiracy to attempt to monopolize"; the entire opinion indicates that no such crime exists.

Accordingly, insofar as U.S.S. seeks partial summary judgment on the claim that it conspired to attempt to monopolize the production and sale of cement or ready-mixed concrete in any geographic market, the motion is granted.

## C. *Alleged Acquisition of Stock or Assets*

U.S.S. seeks summary judgment in its favor as to Southern's claim for damages

---

14. It is clear from the opinion that the phrase "conspiracy to attempt to . . ." appeared twice on the form for recording the jury verdict; the charges to the jury were not the subject of the appeal.

15. The Court stated that "conspiracy to attempt to monopolize" could have only four conceivable meanings: (A) conspiracy to monopolize, (B) conspiracy to fail to monopolize, (C) attempt to monopolize and (D) attempt to fail to monopolize. Since meanings B and D are *"nonsense"* and since the jury had been unable to agree as to the count which charged a conspiracy to monopolize (meaning A), the Court construed the verdict as finding an attempt to monopolize. *Id.* at 84.

for an alleged violation of § 7 of the Clayton Act, 15 U.S.C. § 18. The acquisition complained of is alleged to be the "acquisition" of Williams Brothers by U.S.S. The latter seeks summary judgment on this issue based on the allegations that it has never purchased, possessed, or otherwise acquired a single share of stock in Williams and that it has never purchased, possessed or otherwise acquired any asset of Williams. *See* U.S.S.'s Statement of Material Facts, No. 15 and 16. It argues that plaintiff's contention that the right of first refusal as to Williams Brothers' stock granted to U.S.S. and exercisable in the event of default on a loan made by Trust Company of Georgia to Williams Brothers and guaranteed by U.S.S., amounts to an "acquisition" of stock or assets is insufficient as a matter of law. U.S.S. further contends that even if viewed as an "acquisition" within the meaning of § 7 of the Clayton Act, plaintiff was not, and could not, have been damaged by such arrangement.

Plaintiff opposes this portion of the motion with the following contentions:

1. The circumstances surrounding the vertical financing and business arrangement existing between U.S.S. and Williams Brothers were tantamount to vertical integration (a supplier's acquisition of its customer) and as such indicate a probability that U.S.S. used ·and will continue to use its dominant guarantor's position as leverage to put pressure upon the debtor to substantially lessen competition in the Portland cement and ready-mixed concrete industries in the relevant geographic markets.

2. This vertical arrangement afforded Williams Brothers decisive cost advantages in these markets over its nonintegrated competition, such as Southern in the purchase of the costliest concrete ingredient, Portland cement, which advantages when passed on in the form of lower concrete prices to consumers resulted in prices lower than Southern's costs, ultimately forced Southern out of business in October, 1969.

It contends that U.S.S.'s "undue influence" over Williams Brothers of the "collateral security option to purchase Williams Brothers' outstanding stock" is an "acquisition" within the meaning of § 7. It argues that this arrangement is ipso facto violative of § 7, but if the court is "not disposed" to enter such a determination, it is "critical" that the term "acquisition", as used in § 7, "encompasses such coercive loan arrangements and its anticompetitiveness is reserved for jury deliberation." Plaintiff stresses that "summary judgment is manifestly inappropriate on the issues of intent and state of mind necessarily raised by inquiry into the circumstances surrounding the creation and operation of this vertical combination." Both parties to this motion rely on Metro-Goldwyn-Mayer v. Transamerica Corp., 303 F.Supp. 1344 (S.D.N.Y.1969) (hereinafter "MGM") in support of their contentions.

 Section 7 of the Clayton Act, 15 U.S.C. § 18, provides, in pertinent part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. . .

There can be a claim for money damages, pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, for a violation of § 7 of the Clayton Act. Dailey v. Quality School Plan, Inc., *supra*; Gottesman v. General Motors Corp., 414 F.2d 956, 961 (2d Cir. 1969). *See* Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.,

381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965).

▮▮▮▮ A claim for damages for violation of § 7 presents the questions of whether there has been an acquisition of stock or assets within the meaning of § 7; if so, whether plaintiff can claim damages on account of such acquisition; what is the appropriate section of the country; and whether there is a reasonable probability of a substantial lessening of competition. Where there is no "acquisition" of stock or assets, therefore, the other questions need not be answered and a claim for damages will not lie. *See infra*, at note 7 and accompanying text. The words "acquire" and "assets" are not terms of art or technical legal language; they are generic, imprecise terms encompassing a broad spectrum of transactions whereby the acquiring party may accomplish the acquisition by means of purchase, assignment, lease, license, or otherwise. United States v. Columbia Pictures Corp., 189 F.Supp. 153, 181–82 (S.D.N.Y.1960).

In the instant case it is not in dispute that in 1965 and 1966 the Trust Company of Georgia (TCG) granted three loans to Williams Brothers. U.S.S. agreed with TCG that it would guarantee repayment of the loan in the event of default by Williams Brothers. These guarantees were secured by the right of first refusal to purchase stock of Williams Brothers, a right which was to remain in effect only while there were outstanding balances on the loans.[16] Two of the loans have been repaid in full by Williams Brothers; and thus, the right of first refusal in the event of default on these loans no longer exists. The guarantee with respect to the third loan has been withdrawn by U.S.S. *See* U.S.S.'s Statement of Material Facts, No. 11, 12, 13 and 14.

▮▮▮▮ It is clear that the right of first refusal in the event of default was never exercised and will never be exercised because such right is now non-existent. Thus, U.S.S. never possessed, in any meaningful sense of the word, the stock of Williams Brothers. The court finds that characterizing the right of first refusal for the purchase of stock granted to a guarantor of a loan furnished by a third party as an "acquisition" within the purview of § 7 of the Clayton Act stretches the language of this section to absurd lengths and, further, that such characterization could have serious deleterious effects on the commercial transactions of corporations and lending institutions.

As both parties rely to some extent on *MGM, supra,* a short discussion of that opinion and a comparison to the situation here involved is appropriate. In the *MGM* case plaintiff M.G.M. sought to enjoin the defendants from proceeding with a cash tender offer by Tracy Investment Company for M.G.M. stock. 303 F.Supp. at 1346. The cash tender offer was being financed by Transamerica Financial Corporation, whose parent corporation Transamerica Corporation, owned 99.6% of United Artists Corporation, a major competitor of M.G.M. The court found that the acquisition by the Transamerica-United Artists group of working control of M.G.M. stock *"would* violate" § 7 of the Clayton Act, 303 F.Supp. at 1348 (emphasis added), and thus, that the existing Financial-Tracy loan arrangement "pose[d] a threat of violation of § 7." 303 F.Supp. at 1349 (emphasis added). The court granted M.G.M. preliminary injunctive relief restraining defendants from further proceeding with the tender offer until the Financial-Tracy loan agreement was terminated or amended to provide that any M.G.M. shares acquired by Tracy would not be delivered or pledged with Financial, its parent Transamerica, or any of their affiliates. 303 F.Supp. at 1354.

16. U.S.S. explains in its brief in support of its motion for partial summary judgment that the option to purchase stock would come into play only if Williams Brothers notified U.S.S. that a third party had offered to buy the Williams Brothers' stock.

The *MGM* case is distinguishable from the action *sub judice* in several respects. In *MGM* the court was faced with a creditor-debtor relationship with the loan secured by the shares to be acquired in the tender offer. Herein, the challenged relationship is that of guarantor and principal debtor with the guarantee secured by the right of first refusal as to the purchase of stock. Secondly, the creditor in *MGM* controlled a major competitor of the corporation whose stock was the subject of the tender offer. Here it is not alleged that U.S.S., the guarantor, was itself or through its subsidiaries, in the ready-mixed concrete business. Finally, and most important, *MGM* is a decision on a motion for a preliminary injunction. Here damages are being sought.

Section 16 of the Clayton Act, 15 U.S. C. § 26, permits a private party to seek injunctive relief against *"threatened* loss or damage by a violation of the antitrust laws." (Emphasis added).[17] In Credit Bureau Reports, Inc. v. Retail Credit Corp., 476 F.2d 989 (5th Cir. 1973), the Fifth Circuit Court of Appeals explained:

> Section 16 of the Clayton Act entitles private litigants to injunctive relief from threatened injury resulting from a violation of the antitrust laws. To obtain such relief the complaining party must prove that the alleged offender either already has violated the antitrust laws *or that such violation is impending* and that, because of this violation, he is threatened with loss or injury. Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

*Id.* at 992 (emphasis added). The *MGM* court specifically found that the "threat" of a § 7 violation warranted injunctive relief. Its finding that acquisition of the M.G.M. stock "would violate" § 7 indicates that there would be no violation thereof until default and the resulting acquisition. The distinction between a private party seeking injunctive relief and one claiming damages is crucial.

Further, the Second Circuit Court of Appeals, in F. T. C. v. PepsiCo, Inc., 477 F.2d 24 (2d Cir. 1973), stated that it is "elementary" that intentions of the acquiring corporation are *not* to be considered in determining whether a § 7 violation occurred, but that it was helpful to examine them in light of the extraordinary relief [a preliminary injunction] which was sought. *Id.* at 30. Thus, plaintiff's contention that the intent of U.S.S. must be considered and *that intent is a matter for the jury* does not preclude summary relief. Again, the distinction between a claim for damages and a request for injunctive relief is crucial.

The court wonders whether counsel for plaintiff was attempting to actively mislead the court in its discussion of the *MGM* decision; the brief in opposition to the partial summary judgment motion reads as follows:

> Finally, that the court premised its holding—that the subject loan arrangements posed such a threat to competition as envisioned by the language of Section 7—on its implicit finding that the subject loan arrangements were tantamount of [sic.] an acquisition. *In arriving at that determination, the court opined that whether a particular creditor debtor relationship is violative of Section 7*
>
> "depends upon whether such probability is revealed from the surrounding circumstances, including the expressed purpose of the relationship, the debtor's solvency or insolvency, the terms, and the size of the loan, the percentage which it bears to the debtor's entire debt and capital structure, the existence or non-existence of other contracts of [sic.] relationships between the parties, etc.

17. *Cf.* § 4 of the Clayton Act, 15 U.S.C. § 15, quoted on page 5, *supra.*

It would be naive, of course, to believe that a powerful creditor, which has placed a debtor in a position as leverage to put pressure upon the debtor to conduct its business, including its control over others, in a way that would accord with the creditor's interest. *If the evidence revealed such an intent, or if the likelihood of such conduct could be reasonably inferred from the surrounding circumstances,*

*ibid, private recovery would be appropriate.*

Plaintiff's brief at p. 59 (emphasis in *MGM* quotation supplied by plaintiff; emphasis in rest of quotation supplied by the court). Reference to the published opinion shows that the MGM court was *not* discussing "whether a particular creditor debtor relationship is violative of Section 7" and did *not* opine that "private recovery would be appropriate." The quotation, seemingly deliberately pulled out of context, begins with: "In our view, therefore, the question of whether a debtor creditor relationship *must be enjoined* as threatening competition in violation of § 7 depends upon . . ."; the last sentence of this quotation reads (in its entirety): "If the evidence revealed such an intent, or if the likelihood of such conduct could reasonably be inferred from the surrounding circumstances, *a case for injunctive relief might exist.*" 303 F. Supp. at 1351 (emphasis added). If counsel for plaintiff assumed that this court would rely on a quoted portion of another decision without referring to the test of the opinion in the officially reported form, they were seriously mistaken.

In light of this court's conclusion that the guaranteeing of a loan in return for a right of first refusal for the purchase of the debtor's stock is not an acquisition of stock or assets and, thus, does not give rise to a claim for damages [18] due to a violation of § 7, this portion of U.S.S.'s motion for partial summary judgment is granted.

### D. *Alleged Price Discrimination in Cement Sales*

The next portion of U.S.S.'s motion for partial summary judgment seeks summary judgment on Southern's claims under § 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 2(a), for the reason that Southern has made no purchases of cement from U.S.S./U.A.C. Movant relies on Klein v. Lionel Corp., 237 F.2d 13 (3d Cir. 1956) and National Auto Brokers Corp. v. General Motors Corp., 376 F.Supp. 620 (S.D.N.Y.1974), as support for its contention. It states in its reply brief that for purposes of its motion it is assumed arguendo that U.S.S. sold cement to certain purchasers in the Atlanta metropolitan area at discriminatory prices. It further states in this brief that the parties are not in dispute as to the issue presented to the court: "Whether plaintiff's status as a non-purchaser of cement from U.S.S. deprives plaintiff of a right of action against U.S.S. for discriminatory sales of cement by U.S.S."

In opposition to this portion of the partial summary judgment motion plaintiff relies solely on Perkins v. Standard Oil Co., 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969). After an extensive discussion of the *Perkins* decision plaintiff concludes:

The only possible interpretation of this holding is that despite the number of distributive levels through which the price increment passed, the injury to Perkins, as to Southern, was direct and proximate.

Under either of these analyses, *the indirect purchase claims of Southern* must stand. If the *Perkins* case holds that no privity is required, then the

---

18. The court does not express any opinion on the question of whether Southern could have obtained injunctive relief, pursuant to § 16 of the Clayton Act, while the loans were outstanding.

entire premise of U.S.S. in this section must fail.

Plaintiff's brief in opposition at 69 (emphasis added).

The court agrees with movant that plaintiff's reliance on the *Perkins* decision is misplaced. *Perkins* was an action brought by a direct purchaser of gasoline and oil from Standard Oil Company, the defendant, for price discrimination in sales of gasoline by Standard. The question before the Court was *not* whether plaintiff Perkins had standing; the decision makes clear that Perkins purchased gasoline and oil from Standard at a higher price than that charged by defendant to its own Branded Dealers and to Signal Oil Company. 395 U.S. at 644, 645, 89 S.Ct. 1871. Rather, the question before the Court was whether plaintiff could recover for damages suffered by plaintiff as a result of the price advantage granted by defendant to Signal, passed on by Signal to is subsidiary, and then passed on by the subsidiary to its subsidiary. The Court held that if the injured party was able to show a causal connection between the price discrimination in violation of the Act and the injury suffered, he could recover damages "regardless of the 'level' in the chain of distribution on which the injury occur[red]." 395 U.S. at 648, 89 S.Ct. at 1874. It noted that there was substantial evidence from which the jury could infer causation [of injury due to the price discrimination]. *Id.* Review of the decision indicates that the Court was not presented with an issue of standing to sue but rather with the extent of damages recoverable. With reference to the question of whether the plaintiff could recover for financial losses he suffered as an individual because his two failing corporations were unable to pay him agreed brokerage fees for securing gasoline, rental on leases of service stations and other indebtedness, the Court stated:

> It is clear, in this case, however, that Perkins was no mere innocent bystander; he was the principal victim

of the price discrimination practiced by Standard. *Since he was* directly injured and was *clearly entitled to bring this suit*, he was entitled to present evidence of all of his losses to the jury.

*Id.* at 649–50, 89 S.Ct. at 1875 (emphasis added).

The Court does not take issue with plaintiff's discussion of the *Perkins* decision; but we do not accept its conclusions as to the *Perkins* holding or its applicability to this case. Further, we do not understand its reference to "the indirect purchase claims of Southern." Plaintiff does not dispute defendant's Statement of Material Fact that it never purchased cement from U.S.S. during the statute of limitations period. It offers no allegation or evidence to indicate that it purchased cement from U.S.S. "indirectly." We agree with U.S.S. that "there is a dispositive difference between being an indirect purchaser and having never purchased at all." U.S.S. reply brief at 14.

Our conclusion that plaintiff's reliance on *Perkins* is misplaced does not, however, automatically lead to the conclusion that summary judgment on this issue is appropriate. Having concluded that the holding in *Perkins* is not concerned with standing, we must look to other case law to determine whether plaintiff's status as a "non-purchaser" deprives it of the right of action for damages on account of alleged price discrimination in cement sales by U.S.S.

The cases cited by defendant seem to support its conclusion that a plaintiff seeking to recover damages for price discriminations must be a purchaser from the price discriminator. *See* Klein v. Lionel Corp., *supra* at 14–15; National Auto Brokers Corp. v. General Motors Corp., *supra* at 626. However, a recent decision by the Fifth Circuit Court of Appeals, sitting en banc, indicates that a plaintiff's status as a "non-purchaser" does not automatically deprive him of a right of action for damages. In Littlejohn v. Shell Oil Co.,

483 F.2d 1140 (5th Cir. 1973) (en banc), cert. denied, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743, the Court was presented with an appeal in an action brought by an operator of an independent gasoline station against several major gasoline suppliers. Plaintiff therein alleged that defendants through two stations within a mile of his station began selling gasoline to the public below his selling price although selling to others in the Dallas area at normal prices. Plaintiff alleged that defendants' purpose was to drive him out of business. The court concluded that plaintiff had alleged a classic case of violation of § 2(a) by discrimination in sales at wholesale by sellers to their purchaser who competed with plaintiff and with resulting injury to his business within the contemplation of § 4 of the Clayton Act. In a footnote the court added:

> We put aside the alternative theory of the district court that the plaintiff was not possessed of standing under § 2(a) to sue. The reasoning was that the purpose of § 2(a) was to prevent injury to purchasers from the discriminatory pricing practices of the same seller. This is only one purpose of the Act. It is settled that the Act also grants protection to a competitor whose business is injured by the discriminatory pricing policies.

*Id.* at 1143 n. 3 [citations omitted]. In *Littlejohn* plaintiff was the competitor of the persons who had received the benefit of the discriminatory pricing policies from defendants.[19]

As this portion of U.S.S.'s motion seeks summary judgment solely on the ground that plaintiff was not a purchaser from U.S.S., and as the *Littlejohn* decision indicates that such a finding is not dispositive as to standing to sue, this portion of the summary judgment

motion is denied. This denial does not, however, mean that the issue must be submitted to the jury. Before plaintiff's claim can be submitted to the jury, it must, inter alia,[20] present evidence not only of price discrimination in cement sales by defendant U.S.S., but also it must present evidence sufficient to support an inference that it was injured *by reason of* the price *discrimination.* While plaintiff has not submitted evidence of any injury on account of the discrimination in prices rather than injury due to low prices generally, the issue of sufficiency of the evidence was not presented by this portion of U.S.S.'s motion. Thus, the question of whether plaintiff was so injured must be left for trial.

### E. Alleged Monopolization and Attempted Monopolization of Ready-Mixed Concrete Markets

In the last portion of its partial summary judgment motion U.S.S. seeks summary judgment as to allegations of violation of § 2 of the Sherman Act by monopolization and attempted monopolization[21] of ready-mixed concrete in any relevant market for the reason that U.S.S. has never competed or been involved in such markets. In its brief it recognizes that both monopolization and attempted monopolization can be effected by concerted activity. It argues, however, that where concerted monopolization or attempts to monopolize have come before the courts, the concerted action has involved horizontal combinations, with each of the multiple defendants having itself manufactured or sold within the relevant product market.

Plaintiff's opposition to this portion of the motion is somewhat confusing. It speaks of U.S.S.'s *"inaccurate* sup-

19. Reference to the panel decision vacated by the Court en banc shows that a separate corporation (Sooner Oil Company) was one of the defendants' local wholesale dealers. 456 F.2d 225, 226 (5th Cir.1972). Thus, the reference to protection of competitors seems to include competitors of purchasers from the

price discriminator as well as competitors at the same level.

20. *See, e. g.,* Bacon v. Texaco, Inc., 503 F. 2d 946, 948 (5th Cir. 1974).

21. *See also* Part I, B, *supra.*

position that Southern has charged UAC unilaterally with attempting to monopolize or with monopolizing the production and sale of ready-mixed concrete product in three relevant geographic markets" .(emphasis added); then, it continues with the statement that "[t]o the contrary, Southern has explicitly alleged only that U.S.S. (UAC) in conjunction with Williams Brothers, have *jointly* and *severally* engaged in [a contract, combination and conspiracy to monopolize and to attempt to monopolize [22] and an attempt to monopolization.]" Most of the rest of plaintiff's brief on this issue is concerned with combination or conspiracy to monopolize, which claim, as U.S.S. emphasizes in its reply brief, is not before the court on this summary judgment motion.

 Section 2 of the Sherman Act, 15 U.S.C. § 2, provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

A private party is entitled to sue for damages on account of violation of this section if he meets the requirements set out in § 4 of the Clayton Act, 15 U.S.C. § 15.[23] It is clear from the statute that three distinct offenses are proscribed: (a) monopolization, (b) attempted monopolization and (c) combination or conspiracy to monopolize. Defendant U.S.S. is clearly not seeking summary judgment with respect to allegations with respect to the third mentioned offense: combination or conspiracy to monopolize. If, as the brief in opposition perhaps suggests, plaintiff

is alleging and will attempt to prove only that U.S.S. combined (or conspired) with Williams Brothers to monopolize the ready-mixed concrete markets, then, of course, issues as to monopolization or attempted monopolization of such markets by U.S.S. would not be submitted to the jury.

 The fact that this portion of the partial summary judgment motion is opposed, however, suggests that plaintiff is still attempting to hold U.S.S. liable to it for monopolization and attempted monopolization of the ready-mixed concrete markets. To be guilty of monopolizing a "line of commerce" or relevant market, there must be the power of controlling prices or unreasonably restricting competition in the product. See United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Credit Bureau Reports, Inc. v. Retail Credit Co., 358 F.Supp. 780 (S.D.Tex.1971), aff'd, 476 F.2d 989 (5th Cir. 1973). The essence of the charge of attempted monopolization is not that monopolization is a *fait accompli*, but that defendant or defendants have manifested a specific intent to do what the law forbids.

The court finds that this portion of U.S.S.'s motion must be denied for two reasons. First, while its brief in support of its motion states that U.A.C. has never made or marketed ready-mixed concrete anywhere within the defined territories, such factual allegation does not appear in its Statement of Material Facts and, even in the brief, is not supported by reference to evidentiary material in the record. Since the allegation does not appear in its Statement of Material Facts, it cannot be deemed admitted even though Southern's brief in opposition does not specifically set the matter in dispute. *See* Local Court R. 91.72.

 Second, it has been recognized that where by monopolizing one field, a party secured dominant market power

---

22. *See* Part I, B, *supra.*

23. *See* Part I, A, *supra.*

in a second field, such party has monopolized the second field in violation of § 2 of the Sherman Act. *See* Credit Bureau Reports, Inc. v. Retail Credit Co., supra at 793; Coleman Motor Co. v. Chrysler Corp., 376 F.Supp. 546 (W.D. Pa.1974); United States v. United Shoe Mach. Corp., 110 F.Supp. 295 (D.Mass. 1953).

 While it may be difficult for plaintiff to prove that U.S.S./U.A.C. monopolized or attempted to monopolize the ready-mixed concrete market if, in fact, U.S.S./U.A.C. never manufactured or sold ready-mixed concrete, the motion is not based on lack of proof. As movant's allegation as to nonparticipation in this market is not referenced to evidentiary material in the record nor found in its Statement of Material Facts, and as this portion of the motion is not based on an alleged lack of proof, the court declines to foreclose plaintiff from the opportunity to submit proof on these issues; thus, whether plaintiff has sufficient evidence as to these violations to warrant submission thereof to the jury must await trial.

Accordingly, the court finds that movant has not satisfied its burden under Rule 56(c), Fed.R.Civ.P., as to this issue and that summary judgment thereon must be, and hereby is, denied.

## II. MOTION TO STRIKE AFFIDAVIT

Defendant U.S.S. has moved to strike the affidavit of Walter B. Dobbins, which was submitted in support of the brief in opposition to partial summary judgment, on the ground that it does not conform to the requirements of Rule 56(e), Fed.R.Civ.P.[24] Specifically, U.S.S. contends that the affidavit does not show affirmatively that the affiant is competent to testify to the matters stated therein and contains unsupported "facts" "obviously" not within the personal knowledge of the affiant and which would not be admissible in evidence. U.S.S. lists a number of statements made in the affidavit which, according to U.S.S., could not be within the personal knowledge of the affiant, or would normally call for expert testimony.

Plaintiff has filed a brief in opposition to the motion to strike. While plaintiff states that the motion to strike is "clearly void of merit," it "does not deny, and will not mis'ead the court by doing so, that in several instances the affiant's statements are argumentative and contain conclusionary statements."[25] Plaintiff argues that it is not necessary to strike the entire affidavit and urges the court to disregard those portions of the affidavit which may be conclusionary or otherwise objectionable. Plaintiff has submitted with its brief in opposition to the motion to strike another affidavit executed by Mr. Dobbins. He states that together these affidavits indicate that the affiant "is as knowledgeable as any person in the ready-mixed concrete business" and further show that there was a close comradery between producers in that industry so that they "became personally aware of virtually every aspect of each other[']s business."

 An affidavit submitted in connection with a summary judgment motion is subject to a motion to strike if it does not measure up to the standards of Rule 56(e). 6 Moore's Federal Practice ¶ 56.22 (1974). While the court may strike or disregard the inadmissible portions of such affidavit not in conformity with the rule and consider

24. Rule 56(e), Fed.R.Civ.P., provides, in pertinent part:

Supporting or opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . .

25. Unfortunately, plaintiff does not identify which portions he admits are argumentative or contain conclusionary statements. Thus, it is somewhat difficult to determine the extent to which U.S.S.'s contentions as to noncompliance with Rule 56(e) are disputed.

the rest of the affidavit, the entire affidavit may be disregarded if inadmissible matter is so interwoven or inextricably combined with the admissible portions that it is impossible, in the practical sense, to separate them. *Id. And see* cases cited at *id*. nn. 49–51.

In the instant case, while plaintiff's Counterstatement of Material Facts in opposition to the summary judgment motion is quite a contrast to U.S.S.'s Statement of Material Facts, the statements in the latter are not specifically disputed in the Counterstatement. The motion for partial summary judgment presented numerous questions of law; for the most part it did not address itself to insufficiency of proof. In ruling on the motion, the court granted certain portions thereof based on facts which were not in dispute. Other portions were denied as the court found that the contentions of law relied upon by U.S.S. were too broad and that it had not satisfied its burden, pursuant to Rule 56(c), so as to entitle it to summary judgment in its favor.

The court does not feel that it is necessary to strike the affidavit of Mr. Dobbins, which was filed on January 31, 1975, at this time. As the material in that affidavit did not warrant denying such portions of the motion as were granted, and as it was not the ground for denial of other portions of the motion, a ruling is not now required.

While in some cases a request, pursuant to Rule 56(g), for reasonable expenses which the affidavit caused the other party to incure might necessitate a ruling on the motion to strike, the court does not feel that the request of U.S.S. for such expenses necessitates a ruling on the motion at this time. Rule 56(g) authorizes an award of such expenses when it should appear to the satisfaction of the court that "any of the affidavits presented pursuant to [Rule 56] are presented *in bad faith or solely for the purpose of delay*." (Emphasis added.) The court finds that the record herein does not provide sufficient support for a finding of bad faith or purposeful delay to warrant a Rule 56(g) award of expenses.

Accordingly, the motion to strike the January 31 affidavit of Mr. Dobbins is denied at this time.

This denial, however, does not constitute a ruling or indication that the affidavit, or similar statements by the affiant as a witness, would be admissible at trial. Further, it does not constitute a ruling or indication that it is proper for a party to submit a new affidavit after a motion to strike to show that the affiant is competent to testify as to the matters in the first affidavit. Rule 56(e) states that the affidavit submitted in support of or in opposition to the motion for summary judgment, rather than a subsequent affidavit, "shall show affirmatively that the affiant is competent to testify to the matters stated therein."

In sum, the court has today granted in part, denied in part the motion of defendant United States Steel Corporation. It has denied at this time its motion to strike the January 31, 1975 affidavit of Mr. Walter B. Dobbins.

It is so ordered.